JUDGE TORRES

# 18 CV 2206

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRI CT OF NEW YORK

———————————————————————X

AMY R. WEISSBROD GURVEY,

    USPTO Patentee, Plaintiff,

-against-

Hon(s). Jonathan Lippman, Peter Tom, Luis Gonzalez, Rolando
Acosta, Thomas Cahill, Sherry Cohen, David Spokony,
Jorge Dopico, Alan W. Friedberg, Sherry Cohen, James Shed,
Naomi Goldstein, Raymond Vallejo, Orlando Reyes, Lauren Holmes,
Hearing Panel IV, Hinshaw & Culbertson, LLP, Richard Supple,
Hal Lieberman, O. Lee Squitieri, Squitieri & Fearon, LLP,
NYS Office of Court Administration (Lawrence Marks &
John McConnell, chief counsels), State of NY, City of NY
and DOES I-X, Inclusive,

    Defendants.

———————————————————————X

**CASE NO.**

**CIVIL RIGHTS & UNLAWFUL
PATENT TAKING COMPLAINT
42 USC §§1983, 1988**

*Jury Trial Requested*

## I.  Statement of the Case

1.    This civil rights, illegal targeting, unlawful US patent taking and public corruption
lawsuit is filed by USPTO Patentee-Plaintiff Amy R. Gurvey [1] against defendants for depriving
Plaintiff of her rights, privileges and immunities under the First, Fifth and Fourteenth
Amendments of the United States Constitution for twelve (12) years including by contributing to
an unprecedented 8-10 year delay in US patent issuance and enforcement rights to Plaintiff. This
lawsuit parallels: (i) an ongoing investigation before the USPTO Commissioner of Patents after
Plaintiff's early patent applications were abandoned and two application went expired based on
serious ethics violations by the NY law firm of Cowan Liebowitz & Latman that lost Plaintiff
valuable patent claims and priority dates owing to Plaintiff and took several years to revive; (ii) a
criminal civilian complaint and investigation pending before the US Attorney for the Southern

———————————————

[1] Gurvey issued US Patent Nos. 7,603321: D647910S; Plaintiff is sole inventor of a 20-patent
portfolio disclosing systems, apparatuses and designs for the end-to-end management of live
events, from electronic ticketing and registration operation, to transmission of customized event
content and venue security systems.  14 patents were delayed based on the torts of defendants
and are pending for issuance and enforcement.

District of NY; (iii) Plaintiff's SDNY patent breach of fiduciary duty, USPTO ethics and malpractice damages lawsuit duly filed against the Cowan firm before this Court in 2006 [2] that was prejudiced on remand from the 2d Circuit (*fn 2*) based on defendants' unprotected illegal targeting of Plaintiff in contended collusion with Cowan's defense lawyer defendant Richard Supple, himself a theretofore undisclosed AGC executive committee member; and (iv) and a mandamus proceeding originally filed at the Appellate Division First Dept. against respondent current AGC presiding justice Hon. Rolando Acosta seeking AGC compliance with NY's Judiciary Law Part 1240 Amended Statutes including (a) to compel production of all Plaintiff's files since Plaintiff filed protected ethics complaints and in retaliation was unlawfully targeted (JL Part 1240.7); and (b) to disqualify defendant Supple and his insurance defense firm Hinshaw & Culbertson, LLP ("H&C") retroactive to 2006. JL Section 90(10);JL Part 1240.6, .18; *Anderson v. State of NY*, 614 F. Supp. 2d 404 (SDNY 2009)(Scheindlin, J.)[Headnotes, 15,16]; Part 1240.6, Part 1240,7; Part 1240.18; *US Football League v. National Football League* 605 F. Supp. 1448 (SDNY 1985); *Ulico v. Wilson Elser, et al.*, 56 AD 3 1 (AD 1st Dept. 2008); [See also *King v. Fox* 28 Fed. Appx. 95 (2d Cir. 2002) certifying state questions of law to the NY Court of Appeals].

2.      Plaintiff's otherwise proper AGC ethics complaints since 2003 were ignored by defendants against her Cowan patent attorneys in violation of equal protection because rotating AGC administrative presiding justice defendants failed to supervise those AGC staff attorneys and clerks who unlawfully allowed defendant Supple illegal *ex parte* access into the confidential state files concerning Plaintiff and Cowan such that Supple became in possession of confidential documents he had no right or standing to see. In addition, AGC defendants gave defendant Supple unlawful *ex parte* access to materially alter the state confidential files while he was Plaintiff's SDNY adversary. Ergo, Supple played a significant role in creating the withheld AGC documents that were used since 2005 to feign AGC jurisdiction over Plaintiff in 2008 that did not exist, so that defendant Supple could in turn could use the documents that he helped create to prejudice Plaintiff's SDNY damages lawsuit against his clients.

4.      Based on conflicts of interest and potential exposure of AGC First Dept. officers to Plaintiff, defendant Justice Acosta transferred Plaintiff's state mandamus petition [1(iv) above] *sua sponte* to the Second Dept. on January 23, 2018. The mandamus proceeding is now pending before the 2d Dept. with an order to show cause returnable March 9, 2018.

---

[2] 17-2760 (2d Cir). Plaintiff won the first appeal pro se in 2012. 462 Fed. Appx. 26 (2d Cir) (Feb 10, 2012). Plaintiff also won binding SDNY Arbitration against the Cowan firm for breach of her associated employment contract on August 4, 2009. SDNY Arbitrator found that Cowan breached Plaintiff's contract without cause just three weeks after Cowan management signed it; and during the proceedings it was also established that Cowan managing partner William Borchard, Esq., unilaterally altered the rider to insert an extended date stamp that was never shown to Plaintiff or initialed by her. In the interim period, Cowan had stolen Plaintiff's confidential inventions in favor of another client and got that client a patent ahead of Plaintiff.

5.     In the instant related lawsuit, Plaintiff seeks special and consequential damages, 42 USC §§1983, 1988 civil rights damages, attorneys' fees and costs and declaratory determinations against defendants for engaging in relentless unprotected acts of illegal targeting of this Plaintiff over 12 years.  Defendants' illegal targeting being without jurisdiction is not protected under any theory of immunity and caused special damages to Plaintiff's patents, career and reputation, ability to work, undue prejudice to her SDNY lawsuit against the Cowan firm for five years on remand from 2d Circuit in 2012 (*fn 2*) (1.iii) above), and Plaintiff's ability to enforce her patents causing her to suffer delay damages.  *Bradley v. Fisher*, 80 US 335, 354 (1872); *Forrester v. White*, 484 US 219 (O'Connor J.); *Antoine v. Byers & Anderson*, 509 US 429 (1993); *NeuroRepair v. Nath Law Group*, 781 F. 3d 1340 (Fed. Cir. 2015).  Plaintiff is entitled to contribution from every party or entity that contributed to her patent damages.  *Protostorm v. Antonelli*, 834 F. Supp. 2d 141 (EDNY 2011)

## II. Statement of Facts in Support of All Claims

6.     The 2007 *Anderson* litigation and Plaintiff's instant lawsuit are inextricably related.  Both claim violations of the public's absolute right under the First Amendment to file ethics complaints against NY lawyers without fear of retaliation and to be afforded state remedies compliant with equal protection.  Christine Anderson, herself an AGC staff triage attorney, was protecting Plaintiff's ethics complaints duly filed against the Cowan firm when she was terminated from her job as an AGC triage staff and research attorney in 2005.

7.     In this lawsuit, Plaintiff contends that AGC defendants including those previously cited in *Anderson,* engaged in collusion with defendant Supple, a theretofore undisclosed AGC executive committee member starting in 2007-8, suspiciously only after Plaintiff sued the Cowan firm who were Supple's private sector clients before SDNY in 2006; and that AGC defendant staff attorneys and clerks cited in *Anderson, supra*, upon belief, engaged in collusion with defendant Supple, to begin manufacturing and inserting *ex parte* false documents into Plaintiff's confidential state files at the Appellate Division.  All the relevant and altered ethics files have since been improperly withheld from Plaintiff in defiance of due process and JL Part 1240.7 for 10 years.  Defendants' aim was to enable AGC defendants to create false documents that could feign disciplinary jurisdiction over Plaintiff that AGC defendants knew did not exist so that defendant Supple could quickly achieve state orders that could be used to collaterally prejudice Plaintiff's recovery rights before SDNY, even if lacking in jurisdiction, and could not vacated by the federal court.

8.     In 2005, when plaintiff Christine Anderson was terminated from her AGC staff attorney position, her administrative supervisors were also ignoring Plaintiff's ethics complaints against the Cowan firm in violation of equal protection of Plaintiff's rights under NY's Judiciary Law Section 90.  In addition, presiding justice defendants were breaching their purely administrative, statutory duties to Plaintiff to supervise those staff attorneys whose duty it was to process her

ethics complaints and get Plaintiff her USPTO inventorship files returned from the Cowan firm. Plaintiff needed her complete USPTO files compelled from Cowan to attempt to reverse or mitigate damages to her portfolio, already caused by Cowan's serious breaches of fiduciary duty duty and USPTO ethics violations. Cowan had also erased material USPTO files from a CD ROM sent to Plaintiff in 2003. The withheld and erased files included Cowan's powers of attorney filed at the USPTO in 2003 that Cowan attorneys and defendant Supple, as Cowan's agent, swore to SDNY for 12 years did not exist. The delay caused to Plaintiff's USPTO prosecution and enforcement rights entitles Plaintiff to recover so-called "delay patent damages" against all contributing defendants. *NeuroRepair v. Nath Law Group*, 781 F. 3d 1340 (Fed. Cir. 2012)

9.      Because AGC defendants did not compel production of Plaintiff's files and defendant Supple and Lieberman never disclosed conflicts of interest and that they were involved with altering the relevant ethics files as state officers, defendant Supple was able to concealed that he got illegal ex parte access into the files without standing or a warrant in defiance of JL Section 90(10); JL Part 1240.18. Defendants were also able to continue Plaintiff's illegal targeting unchecked for 12 years, ruin Plaintiff's professional reputation, her patent company and ability to enforce her patents internationally before courts of competent jurisdiction and made it impossible for Plaintiff to work. Defendants also caused extended and undue prejudice to Plaintiff's recovery rights before SDNY against the Cowan firm.


### III. Governing Case Precedents

10.     In *Anderson v. State of NY*, 614 F. Supp. 2d 404 (SDNY 2009), AGC defendants herein were found by SDNY Judge Shira Scheindlin to have potentially violated the First Amendment rights of Christine Anderson, a state AGC triage and research attorney, for terminating Anderson from her state job in 2005. Anderson was terminated allegedly for being a whistleblower and attempting to protect the First Amendment rights of public citizens to file ethics complaints against NY attorneys without fear of retaliation and to be afforded standard state relief compliant with equal protection under NY's Judiciary Law.   Plaintiff contends that because she had no state job that could be terminated by AGC defendants, a different scheme had to be conjured up to prevent her recovery against defendant Supple's private sector clients who were her patent attorneys at the Cowan firm because defendant Supple had no defense to Cowan's serious USPTO ethics violations.

11.     Standard state remedies to be afforded aggrieved victims of attorney ethics violations in NYS under NY's Judiciary Law ("JL"), include orders against the reported attorney to return the client's files upon abandonment or withdrawal and to succumb to mediation on stolen retainer

funds. Plaintiff was denied and continues to be denied these state orders since 2003 in defiance of equal protection and defendants' administrative, statutory duties to Plaintiff. [3]

12.     In 2013, the US Supreme Court mandated that adjudication of patent attorney ethics claims and damage claims are the state's exclusive responsibility and that the federal courts lack jurisdiction to hear these claims. *Gunn v. Minton*, 133 S. Ct. 1059 (USSC Tex. 2013)(Roberts J). Defendants still defied the law and did not compel Cowan to turn over Plaintiff's complete USPTO files or turn over their own AGC files since Plaintiff filed her state ethics complaints including communications with the Cowan firm and defendant Supple.

13.     In *Anderson*, SDNY specifically found the evidence that citizens' ethics complaints - even if serious - were "whitewashed" 100% of the time if the reported attorney was being represented by AGC executive committee members or former chief counsels in their private sector law firms. This is precisely what transpired in Plaintiff's case.

14.     SDNY's findings are determinative of Plaintiff's First Amendment unlawful retaliation claims in the instant lawsuit. Defendants Supple and Lieberman, who were long-standing AGC executive committee members and former chief counsel who were involved with the state ethics files involving Plaintiff and Cowan, got illegal ex parte access to the confidential state files and unilaterally altered these files. *Anderson v. State of NY*, 614 F. Supp. 2d 404 (SDNY 2009)(Scheindlin, J.)[Headnotes, 15, 16]; *Ulico v. Wilson Elser, et al.*, 56 AD 3 1 (AD 1st Dept. 2008).

15.     The facts are no better established than by the April 21, 2016 order of First Dept. Defendant justice Peter Tom, also cited by the Anderson Court, concedes that access was given to defendant Supple to the confidential files in defiance of law and without standing or a warrant. JL Section 90, JL Part 1240.18. In improperly accepting and continuing in Cowan's insurance defense retainer, defendant Supple has been an agent of two conflicting entities - the First Dept. AGC which had duties to assist Plaintiff as an aggrieved victim of attorney ethics violations, and of the Cowan attorneys, who engaged in the ethics violations against this Plaintiff. Those conflicts could never be reconciled.

16.     Even after Plaintiff won binding SDNY arbitration on breach of employment contract claims against the Cowan firm in 2009 and then a pro se appeal before 2d Circuit in 2012 upholding her claims for patent breach of fiduciary duty, fraud and malpractice, based on Justice Tom's order, Supple's ex parte misconduct in the state confidential files continued. Based therein, on remand from 2d Circuit in 2012 Plaintiff continued to be denied all USPTO document

---

[3] Allegedly, the USPTO has the power to put pressure on a withdrawing attorney to return the client's files by not granting withdrawal until the files are returned to the inventor-client. 37 CFR 11.1116; 37 CFR 10.40. However, as often occurs, the attorneys will falsely swear to the Office of Petitions that he has returned the files and noticed the withdrawal, and the USPTO will often grant the withdrawal before docketing the attorney's petition, depriving the inventor of due process and the right to oppose the withdrawal.

discovery and an amended complaint by the new SDNY Magistrate. *Cold Spring Harbor v. Ropes & Gray*, 840 F. Supp. 2d 473 (D. Mass. 2011)(Transferred from EDNY); *NeuroRepair v. Nath Law Group*, 781 F. 3d 1340 (Fed. Cir. 2015).

17.     The reason was for Magistrate's continuing bias and prejudice were the without jurisdiction orders entered against Plaintiff by AGC defendants commencing in 2011 and 2012 and in breach of administrative duty were never vacated by presiding justice defendants as was their administrative duty to Plaintiff.  In other words, defendant Supple played an instrumental role in causing the prejudice to Plaintiff's SDNY lawsuit through parallel criminal forgery and unilateral alteration of state confidential files in collusion with AGC officers, and the order entered without jurisdiction over Plaintiff were not timely vacated based on further unilateral alterations made by Supple to the state confidential  files.

18.     Based thereon, ,SDNY Magistrate also improperly denied three motions to disqualify Supple and H&C from the Cowan firm's continuing representation (*fn 2*) that is now mandatory under JL Part 1240.6. In very order pertaining to Plaintiff's right per 2d Circuit to document discovery and to amend her complaint, Magistrate kept referring to the state AGC orders orchestrated by defendant Supple via illegal access to the files,  that were in fact issued without jurisdiction over Plaintiff as part of defendants' illegal targeting.

19.     AGC presiding justice defendants had an administrative duty to vacate the orders entered without jurisdiction over Plaintiff and delayed adjudications for 5 years, and again improperly allowed defendant Supple to oppose Plaintiff's motions in the confidential files without standing.

20.     Plaintiff contends that defendants Supple and H&C's disqualification was mandatory since 2006 under JL Part 1240.6 and *US Football League, v. National Football League*, 605 F. Supp. 1448 (1985).  Defendant Supple got unlawful ex parte access into the confidential state files, received confidential information that he used against Plaintiff, and also was improperly allowed by AGC defendants access to unilaterally alter the files ex parte to his own advantage and the advantage of his Cowan clients.

20.     That Plaintiff's constitutional claims are meritorious is no better demonstrated by the fact that NY's Legislature changed the law in enacting Part 1240, making defendants' violations of Plaintiff's constitutional rights, now codified as unlawful.

21.     Plaintiff contends that this Court must now determine what court or state agency is required to enforce JL Part 1240 to mandate the retroactive disqualification defendants Supple, Lieberman and H&C from continuing to represent the Cowan firm before this Court and 2d Circuit; and if necessary, certify those questions to the NY Court of Appeals. See, *King v. Fox*, 28 Fed. Appx. 95 (2d Cir. 2002); NY Court of Appeals Oral Argument, 2006 WL 5876557 (N.Y.) (Oral Argument).

22. In addition, Plaintiff contends that this Court must mandate that defendants Supple,

Lieberman and H&C forfeit to Plaintiff all legal fees realized from the Cowan firm's representation since 2006 for failing to disclose conflicts of interest. *Ulico v. Wilson Elser, et al.*, 56 AD 3d 1 (AD 1st Dept. 2008)

## IV. Defendants' Illegal Targeting of Plaintiff through Criminal Acts

23.     Plaintiff has a more compelling First Amendment retaliation case than Christine Anderson did. This is because AGC defendants' ongoing administrative breaches of duty included ***defendants' unilateral, criminal alteration and manufacture of false state documents that defendants inserted ex parte and allowed others without standing or a warrant to insert ex parte into Plaintiff's confidential state files. These acts demonstrate public corruption and criminal fraud.*** As a matter of law, these egregious acts constitute unprotected breaches of purely administrative, non-judicial duties owed to Plaintiff that are not protected under any theory of immunity. *Bradley v. Fisher*, 80 US 335, 354 (1872); *Forrester v. White*, 484 US 219 (O'Connor J.); *Antoine v. Byers & Anderson*, 509 US 429 (1993).

24.     The manufactured, forged and untruthful documents thus far discovered that defendants inserted *ex parte* into Plaintiff's strictly confidential state files and that were never served on Plaintiff in violation of due process, include a photocopy of a 2008 Appellate Division petition affirmation appended to a frivolous 2008 petition naming Plaintiff as respondent purportedly signed in 2008 by a 2002 former AGC chief counsel Paul Curran, when Curran, in fact, left the AGC in 2002 and was dead of cancer in 2008 [4]. No living AGC officer signed the affirmation or any other affirmation in support of petition and no original signature copy of Curran's signature was ever produced or ordered compelled by presiding justice defendants. In addition, defendants' false entries in their petition say that the petition is based on a previous 1997 Housing Part matter and in response to which defendants had already mailed an admonition notice to Plaintiff in 2005 that ended defendants' disciplinary jurisdiction as a matter of law as to the complete Housing Part case because no subsequent like misconduct was ever cited. 22 NCYRR 603.4 ,603.9 The reference to defendants' admonition notice was fraudulently omitted from the petition. In addition, entered on several pages were falsely sworn averments that Plaintiff maintains a law office at PO Box 1523, New York NY 10013 (when no such office ever existed and Plaintiff never had an office for the practice of law in NYS). [5] This petition was

---

[4] Paul Curran was coincidentally a former partner at Kaye Scholer with Cowan managing partner William Borchard demonstrating how defendant Supple, as Cowan's agent, could have gotten access to Curran's signature and helped other AGC defendants manufacture the false documents.

[5] Plaintiff, inventor of valuable issued US method and apparatus patents in expanded event ticketing and venue security operations, organized a patent software firm in 2000 and has been on inactive status from her original barred State of California since she entered medical school as

also never served pursuant to the CPLR, defendants mailed it without service to Plaintiff in New Jersey, and thereafter, defendants, knowing that jurisdiction was lacking, relentlessly prosecuted the petition for 8 years, bombarding Plaintiff with frivolous motions, letters and papers. These wrongful state actions prevented Plaintiff, who has an ADA-qualifying disability, from being able to work, make a living, complete prosecution of her delayed US patents, protect her interests before court of competent jurisdiction, and also caused Plaintiff to become further immunocompromised with recurrent pneumonia, pleurisy, cancer and ulcerative colitis that required months of hospitalizations.

25.     That defendants actually knew that no disciplinary jurisdiction over Plaintiff existed  is matter of state statutes and their own publications.  22 NYCRR 603.4, 603.9. See _NY Attorney Discipline_, NYLJ Treatise, 2016 Ed. Ch. 6.  The admonition notice sent by AGC defendants to Plaintiff in 2005 pertained to an unrelated HUD tenant matter wherein Plaintiff was the ADA-disabled HUD tenant  represented by an attorney. The admonition was defendants' admission that defendants lost  disciplinary jurisdiction over Plaintiff with regard to all matters contained in the admonition.  In addition, decisions from the US Supreme Court are clear that in order for state disciplinary jurisdiction to exist, the cited attorney must be the attorney in the relevant attorney client relationship for disciplinary jurisdiction, which was not the case here. _Kay v. Ehrle_r, 499 US 432 (1993).

26.     Thereafter AGC defendants and presiding justices breached further administrative duties to Plaintiff in depriving Plaintiff of her files, verbatim transcripts from a 2011 hearing (_Cleavinger v. Saxner_, 474 US 193 (1985) and instructed the Ubiqus transcript company not to offer Plaintiff verbatim transcripts.

27.     Because illegal targeting is deemed breach of a purely administrative, non-judicial function, AGC defendants' heinous, predatory and relentless abuse of process against this Plaintiff over 12 years is not protected under any theory of immunity. _Bradley v. Fisher_, 80 US 335, 354 (1872); _Forrester v. White_, 484 US 219 (O'Connor J.); _Antoine v. Byers & Anderson_, 509 US 429 (1993).  Plaintiff is entitled to recover civil rights damages, attorneys' fees and costs against including special damages to Plaintiff's patents, career and professional reputation. Plaintiff is also entitled to mandamus relief by this Court under _Ex parte Young_, 209 US 123 (1908).against AGC presiding justice defendants for their promulgation of unlawful state protocols for 12 years in violation of Plaintiff's constitutional rights that were confirmed as unlawful by the enactment of JL Part 1240.

28.     Plaintiff's damage claims against defendants Supple, Lieberman and Squitieri extend to their individual capacities and also involve liability of their respective law firms (defendants H&C and Squitieri & Fearon.

---

an ADA-disabled student in 1995.  Plaintiff also formerly retired from the Third Dept. in NYS in 2000 and has never represented a client before any court in CA or NY.

## V. JURISDICTION AND VENUE

29.     Jurisdiction of this Court is invoked under 28 USC §1331; 28 USC §§1343 (3)(4).  Pendent jurisdiction over Plaintiff's state law claims is proper pursuant to 28 USC§ 1367.

30.     This Court has jurisdiction pursuant to 42 USC §§1983, 1988 because AGC defendants are employees and officers of the State of New York within the meaning of §1983.

31.     Venue in this District Court is proper pursuant to 28 USC §1391 (b) because the cause of action arose in the Southern District of New York and because the events or omissions that gave rise ad continue to give rise to many of Plaintiff's constitutional claims occurred in this judicial district.

32.     Because matters in this lawsuit will require resolution of significant issues of federal patent law including application of preempting USPTO patent attorney ethic mandates they are matters in the exclusive jurisdiction of the federal courts.  See, 37 CFR 11.1116; 37 CFR 10.40; 37 CFR 1.36(b); _See also_, _In re Hulquist_, 136 AD 3d 170 (2d Dept. 2016).

33.  Plaintiff also joins NY attorney Lee Squitieri and his firm Squitieri & Fearon, LLP as defendants. Defendant Squitieri was Plaintiff's attorney of record at critical, early stages in the Cowan SDNY lawsuit between 2006-2011[6].  Defendant Squitieri is alleged to have engaged in collusion with defendant Supple, and withheld all Plaintiff's case files after he suspiciously moved to withdraw in 2010 just after Plaintiff won arbitration against the Cowan firm on certain contract counts in August 2009 and Plaintiff's first US patents issued two months later in October, 2009 after an unprecedented 8 years.  Squitieri's unlawful withholding of Plaintiff's SDNY was the subject of a further ethics complaint whitewashed by defendants in violation of equal protection. Plaintiff was then forced move for a writ before Supreme Court (Index No. 120516-2012) and although certain files were produced in 2014, defendant Squitieri remains in contempt, having still failed to turn over his communications with defendant Supple that are Plaintiff's property.  _Cold Spring Harbor Laboratories v Ropes & Gray_, 840 F. Supp. 2d 473 (D. Mass.0211 (Transferred from EDNY).  [7]

---

[6] 06cv1202(SDNY) filed February 15, 2006.

[7] Defendant Squitieri remains in contempt of a 2013 writ entered by Supreme Court of NY (102516-2012) for unlawfully withholding all Plaintiff's SDNY case files after AGC defendants again ignored Plaintiffs' ethics complaints, including the 2009 arbitration files and Squitieri's communications with defendant Supple that are Plaintiff's property.  All AGC files and Squitieri's complete case files are the proper subject of mandamus from this Court pursuant to JL Part 1240.7 and because they were generated during a plaintiff-inventor's federal patent

## COUNTS FOR RELIEF

34.    In summary, in filing this separate civil rights damages in the amount of $10,000,000 per retaliatory harassment claim as in *Anderson*, $10,000,000 in lost salary since 2002, $100,000,000 minimum on patent unlawful taking claims, Plaintiff stands squarely in the derivative shoes of Christine Anderson in seeking damages allowable under the Civil Rights Act of 1871, 42 USC §§1983, 1988, attorneys' fees and costs.  Plaintiff also seeks declaratory determinations and mandamus relief under *Ex parte Young*, 209 US 123 (1908) against AGC presiding justice defendants for promulgating unconstitutional state protocols and breaching purely administrative and statutory duties owed to Plaintiff for 12 years that were since remedied by the JL Part 1240 Amended statutes including the following:

(a) Illegally targeting and abusing process against this Plaintiff knowingly without disciplinary jurisdiction for 12 years in retaliation for her filing absolutely protected ethics complaints against her NY patent lawyers at the Cowan firm under the First Amendment;

(b)Failing to apply preempting USPTO mandates pertaining to Cowan USPTO ethics violations including unilateral withdrawal based on admitted conflicts of interest and failing to return Plaintiff's files.   See, 37 CFR 11.1116; 37 CFR 10.40; 37 CFR 1.36(b);  see also *In re Hulquist*, 136 AD 3d 170 (2d Dept. 2016).

(c) Allowing outsiders such as defendant Supple, an undisclosed AGC executive committee member harboring irreconcilable conflicts of interest, and another NY attorney Lee Squitieri, both who have no standing and no warrant, unlawful *ex parte* access into Plaintiff's strictly confidential state files and breaching further administrative statutory duties by failing to supervise and instruct other AGC staff attorneys and clerks to also maintain the strict confidentiality of these files and prevent unilateral alteration of these files.  JL Section 90(10); JL Part 1240.18;

(d) Failing to ensure that the AGC executive committee members and chief counsels who were involved with the ethics complaints filed by Plaintiff, were not then permitted to accept private sector retainer of the patent attorneys Plaintiff reported for ethics violations unless full disclosure of conflicts of interest was made. JL Part 1240.6;

(e) Failing to compel defendant Supple, Lieberman and H&C to withdraw from the Cowan firm's representation on a timely basis based on undisclosed conflicts of interests and their

---

misconduct and breach of fiduciary duty litigation seeking damages related to USPTO ethics violations by her patent attorneys. *Cold Spring Harbor Laboratories v. Ropes & Gray*, 840 F. Supp. 2d 473 (D. Mass, 2011)(Transferred from EDNY).]

getting access to confidential information contained the state files that defendant then used against this Plaintiff.  JL Part 1240.6;

(f) Failing to ensure and failing to instruct other AGC defendants to ensure that disciplinary jurisdiction in fact existed over Plaintiff before beginning to illegally target, harass and abuse process Plaintiff when no disciplinary jurisdiction existed;

(g)Withholding  Plaintiff's complete Appellate Division files, including communications with defendants Supple and Lieberman, and responses filed by the Cowan firm in response to Plaintiff's ethics complaints to ensure that Plaintiff was afforded due process of law during the illegal harassment and also had the right to confront all witnesses against her (JL Part 1240.7); and

(h)Withholding disciplinary action against each of Cowan, defendant Supple, as Cowan's agent, and Plaintiff's SDNY attorney defendant Lee Squitieri, who were duly reported to AGC since 2008;

35.    All the aforesaid administrative, non-judicial duties owed to Plaintiff by defendants, a USPTO patent inventor were breached for more than 12 years and Plaintiff became the victim of illegal targeting with jurisdiction in retaliation for her exercising her absolutely protected right to free speech under the First Amendment.

36.    Plaintiff demands trial by jury on her claims.

Dated: March 6, 2018
Upper Montclair, NJ

AMY R GURVEY, USPTO Patentee
315 Highland Avenue Upper Montclair, NJ  07043
PH 917-733-9981
email:  amygurvey@gmail.com

KeyCite Yellow Flag - Negative Treatment
Distinguished by Matthews v. City of New York, S.D.N.Y., July 29, 2013

614 F.Supp.2d 404
United States District Court,
S.D. New York.

Christine C. ANDERSON, Plaintiff,
v.
The STATE OF NEW YORK, the OFFICE OF
COURT ADMINISTRATION OF the UNIFIED
COURT SYSTEM, Thomas J. Cahill, in his official
and individual capacity, Sherry K. Cohen, in her
official and individual capacity, and David
Spokony, in his official and individual capacity,
Defendants.

No. 07 Civ. 9599(SAS).
|
April 27, 2009.

**Synopsis**
**Background:** African American state employee brought action against employer and related defendants, alleging that she was unlawfully terminated and subjected to a hostile work environment because of her race, color, and national origin, and that defendants deprived her of the right to make and enforce contracts, unlawfully retaliated against her for having exercised her constitutional right to free speech, violated her Fourteenth Amendment rights to due process and equal protection by discriminating against her, and breached a state collective bargaining agreement. Defendants moved for summary judgment.

**Holdings:** The District Court, Shira A. Scheindlin, J., held that:

[1] employee failed to establish a prima facie case of discriminatory discharge;

[2] conduct which employee complained of was not sufficiently severe to alter the conditions of her employment, and therefore did not give rise to a hostile work environment claim;

[3] employee's alleged workplace comments reporting ethical misconduct were subject to **First** Amendment protection; and

[4] genuine issue of material fact existed as to whether there was a causal connection between public employee's protected speech and her eventual discharge four months later.

Motions granted in part and denied in part.

West Headnotes (18)

[1]     **Civil Rights**
       Hostile environment; severity, pervasiveness, and frequency

       Hostile work environment claims brought under New York state law are governed by the same standards applicable to claims brought under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

       1 Cases that cite this headnote

[2]     **Civil Rights**
       Hostile environment; severity, pervasiveness, and frequency

       Factors considered in determining whether there is a hostile work environment are: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

       2 Cases that cite this headnote

[3]     **Civil Rights**

Case 1:18-cv-02206-AT   Document 1   Filed 03/12/18   Page 13 of 31

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

Hostile environment; severity, pervasiveness, and frequency

To establish a hostile work environment claim, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

3 Cases that cite this headnote

[4]     **Constitutional Law**
Retaliation in general
**Constitutional Law**
Causation; substantial or motivating factor

To establish a retaliation claim in violation of the **First** Amendment right to free speech, a public employee must show: (1) that the speech at issue was protected; (2) that she suffered an adverse employment action; and (3) that there exists a causal connection between the speech and the adverse employment action. U.S.C.A. Const.Amend. 1.

16 Cases that cite this headnote

[5]     **Constitutional Law**
Public Employees and Officials

Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any **First** Amendment liberties the employee might have enjoyed as a private citizen. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

[6]     **Constitutional Law**
Efficiency of public services

So long as public employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

[7]     **Civil Rights**
Discharge or layoff
**Civil Rights**
Motive or intent; pretext

African American court employee failed to establish a prima facie case of discriminatory discharge; although employee showed that her supervisor's conduct toward her was racially motivated and that supervisor supplied the ultimate decision makers with information about employee, there was no evidence that supervisor's racial bias tainted the ultimate decision to terminate her. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

Cases that cite this headnote

[8]     **Civil Rights**
Hostile environment; severity, pervasiveness, and frequency

Negative job evaluations and increased scrutiny, without any attendant consequences such as demotion or diminution of wages, are not adverse employment actions which can support a hostile work environment claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

3 Cases that cite this headnote

[9]     **Civil Rights**
Hostile environment; severity, pervasiveness,

and frequency

Conduct which African American court employee complained of was not sufficiently severe to alter the conditions of her employment, and therefore did not give rise to a hostile work environment claim; employee complained that defendants accused her of refusing to follow instructions, gave her a negative performance evaluation, subjected her to an unwarranted counseling session, and that one supervisor made racist remarks over the course of several years. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

1 Cases that cite this headnote

[10]    **Civil Rights**
        ☞Race, color, ethnicity, or national origin
        **Civil Rights**
        ☞Discrimination in General
        **Civil Rights**
        ☞Contracts, trade, and commercial activity

To establish a claim under § 1981, plaintiff must show that: (1) she is a member of a racial minority group; (2) defendants intended to discriminate against her on the basis of race; and (3) the discrimination concerned one of the activities enumerated in § 1981, which includes the right to make and enforce contracts, the right to sue, and the right to the full and equal benefit of all laws and proceedings for the security of persons and property. 42 U.S.C.A. § 1981.

Cases that cite this headnote

[11]    **Civil Rights**
        ☞Motive or intent; pretext

Intentional discrimination is a necessary element of an employment discrimination claim under both § 1981 and Title VII. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

[12]    **Federal Courts**
        ☞Agencies, officers, and public employees

Public employee's § 1983 claims against governmental entity defendants and the individual defendants in their official capacities were barred under the Eleventh Amendment. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[13]    **Constitutional Law**
        ☞Public employees and officials
        **Courts**
        ☞Ministerial officers in general

African American court employee did not establish equal protection claim against her employer where she failed to show any comparison to similarly situated Caucasian employees accused of insubordination who were treated more favorably than her. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[14]    **Constitutional Law**
        ☞Rights and interests protected in general

At-will employment is not a due process protected property interest. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[15]    **Constitutional Law**
        ☞Attorneys, prosecutors, and Attorney

General's office
**Courts**
☞Ministerial officers in general

Court employee's alleged workplace comments reporting ethical misconduct were made in her capacity as a private citizen, and not as a public employee, and were therefore subject to **First** Amendment protection; employee's speech was not pursuant to her official duties as a Principal Attorney, which were to research legal questions and issues, organize complex investigations, prepare and present complex cases before administrative tribunals and trial and appellate courts, and perform related duties. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

[16] **Constitutional Law**
☞Retaliation in general

For purposes of a **First** Amendment retaliation claim, an employment action is "adverse" if it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

[17] **Federal Civil Procedure**
☞Employees and Employment Discrimination, Actions Involving

Genuine issue of material fact existed as to whether there was a causal connection between public employee's protected speech and her eventual discharge four months later, precluding summary judgment in favor of employer on employee's **First** Amendment retaliation claim; furthermore, issue of fact existed as to whether defendants refused to remove employee's supervisor so they could use employee's inevitable resistance to supervisor's continuing supervision as a pretext for firing her, thereby obscuring their illegitimate and retaliatory discharge of employee. U.S.C.A. Const.Amend.

1.

1 Cases that cite this headnote

[18] **Labor and Employment**
☞Discharge

Failing to hold a hearing prior to the discharge of a confidential, at-will employee did not support a claim for breach of collective bargaining agreement (CBA) since employee was not covered by agreement's hearing requirement.

Cases that cite this headnote

**Attorneys and Law Firms**

*407 John A. Beranbaum, Esq., Beranbaum Menken Ben–Asher & Bierman LLP, New York, NY, for Plaintiff.

Lee A. Adlerstein, Wesley E. Bauman, Assistant Attorneys General, Attorney General for the State of New York, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

Plaintiff Christine Anderson brings suit against defendants[1] pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"),[2] 42 U.S.C. § 1981 ("section 1981"), 42 U.S.C. § 1983 ("section 1983"), New York State Executive Law § 296, and state common law. Plaintiff claims, under both federal and state law, that she was unlawfully terminated and subjected to a hostile work environment because of her race (African American), color (black), and national origin (Jamaican).[3] Plaintiff further claims that defendants: deprived her of the right to make and enforce contracts; unlawfully retaliated against her for having exercised her constitutional right to free speech; violated her Fourteenth Amendment rights to due

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

process and equal protection by discriminating against her; and that defendants NYS and OCA breached a state collective bargaining agreement. In her request for relief, plaintiff seeks, *inter alia*, money damages and the appointment of a federal monitor to oversee the day-to-day operations of the Supreme Court of the State of New York, Appellate Division, **First** Judicial Department ("**First** Department"), Departmental **Disciplinary Committee** ("DDC"). Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss this action in its entirety. For the following reasons, defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. The DDC

The DDC is a **committee** within the New York State Unified Court System responsible for investigating complaints and grievances against attorneys for alleged misconduct in the course of representing **\*408** members of the public.[4] On February 1, 2001, Anderson was hired as a Principal Attorney by the DDC to investigate claims of attorney misconduct.[5] Defendant Thomas Cahill was Chief Counsel of the DDC while Anderson worked there.[6] As head of the DDC, Cahill oversaw the work of the DDC and set policy in close coordination with the DDC Policy **Committee**, the governing body responsible for the overall functioning of the DDC.[7] Defendant Sherry Cohen has worked at the DDC since 1993 and became **First** Deputy Chief Counsel in 2003.[8] Cohen supervises the day-to-day operations of the DDC and reviews its legal work.[9] Defendant David Spokony is the Deputy Clerk of the **First** Department Clerk's Office and is responsible for managing the day-to-day operations of the **First** Department's Clerk's Office.[10]

### B. Plaintiffs Employment at the DDC

From early 2001 through early 2003, plaintiff's work was reviewed and supervised by her caseload supervisor, Judith Stein.[11] Once Stein approved a recommendation made by plaintiff, it was sent to Cahill for his review and approval.[12] After Cahill approved the recommendation, it was sent to the Policy **Committee** which would decide on the discipline to be imposed.[13] In the Spring of 2003, Cohen assumed the position of **First** Deputy to Chief Counsel Cahill.[14] Shortly thereafter, Cohen became Anderson's supervisor.[15]

Starting in 2005, Anderson made repeated complaints to Cahill and Cohen about the DDC's failure to vigorously

prosecute complaints against attorneys accused of misconduct, particularly where the "respondents were either themselves politically connected or they had attorneys who used to work for us."[16] Anderson expressed her concern about improper DDC practices in connection with at least nine cases in which she believed the DDC treated attorneys too leniently.[17] It was one case in particular, the case of "H.," that permanently soured the relationship between Anderson and Cohen.

In September 2005, after a year-long investigation, Anderson completed a proposed report, recommending the admonition of H. for misrepresentation and commingling of client funds.[18] Stein had approved Anderson's recommendation, as had Cahill after a paragraph was inserted at Cahill's request.[19] H. was represented by a former staff attorney at the DDC. After reviewing Anderson's admonition memorandum, Cohen decided that **\*409** it was too harsh and re-wrote it.[20] Anderson told Cohen that it was improper to revise the memorandum to skew the end result and accused Cohen of trying to "whitewash" the case.[21] Cohen, who was offended by Anderson's accusation, reported what Anderson said to Cahill.[22] Cohen then re-wrote the memorandum, removing the most serious finding that H. made misrepresentations to the DDC and diluting the allegations of commingling.[23] Cohen submitted the revised memorandum to the Policy **Committee** in May 2006.[24]

### C. The July 2006 Incident

After the matter of H. concluded, issues continued to arise between Anderson and Cohen.[25] One such incident involved the purchase of a paper shredder. Cohen thought that Anderson was planning to buy a paper shredder for the office without prior approval.[26] Cohen raised her voice during a telephone conversation in which she forbade Anderson from making this purchase.[27] The following Monday, July 24, 2006, Cohen entered Anderson's office and closed the door.[28] Cohen resurrected the shredder issue and asked Anderson whether she had destroyed, or was planning to destroy, case documents.[29] Anderson then got up and moved past Cohen toward the door so she could leave to meet with a complainant.[30] Anderson claims that when she reached for the door handle, Cohen grabbed her hand, dug her nails into Anderson's wrist, and said: "You're not leaving this office."[31] Anderson retreated to the far side of her desk and told Cohen that it would be best, for both of them, if Cohen left Anderson's office.[32] After some hesitation, Cohen stated, "Now I am leaving your office," and slammed the door behind her.[33] At her deposition, Cohen did not specifically recall whether there was any physical contact between them but

conceded that their hands may have touched.[34]

After the July 2006 incident, Anderson asked Cahill to take **disciplinary** action against Cohen.[35] When he failed to do so, Anderson met with former **First** Department Court Clerk Catherine O'Hagan Wolfe on August 8, 2006.[36] At that meeting, Anderson gave Wolfe two written reports *410 recounting the July incidents.[37] Anderson told Wolfe that she did not want Cohen to continue as her supervisor, which she believed to be a reasonable request given the availability of Stein as a supervisor.[38] Anderson informed Wolfe that Cohen's hostility stemmed from disagreements between Anderson and Cohen over the handling of some cases to the perceived detriment to complainants.[39]

At their meeting, Anderson verbally advised Wolfe that the DDC favored certain well-connected respondents and attorneys through lenient treatment otherwise known as "whitewashing," and that such whitewashing tarnished the mission of the DDC. Anderson told Wolfe that she previously complained to Cohen and Cahill about whitewashing in some cases.[40] In particular, Anderson reported that a former DDC attorney, in her role as respondents' counsel, was trying to improperly influence the disposition of cases, acting as "one of the cogs in the wheel of trying to subvert the mission of our office ...."[41] In sum, Anderson stressed to Wolfe that "complainants were not being served."[42]

Wolfe instructed Spokony to set up a fact-finding mediation panel consisting of Spokony and two other court managers, Sara Jo Hamilton and Pat Finnegan.[43] On September 12, 2006, the panel interviewed Anderson and Cohen separately.[44] Anderson told the panel of the July 2006 incident, complained about Cohen's temperament, and requested a different supervisor.[45] Cohen also gave her account of the July 2006 incident and acknowledged that she was responsible for the unfortunate incident.[46] After the interviews were conducted, and written input was submitted by the panel members, Spokony recommended that Cohen: (1) apologize to Anderson for raising her voice and for the physical contact in Anderson's office, and (2) attend a management skills course.[47] Because Spokony found that the supervisor/subordinate relationship could be reestablished, *411 he rejected Anderson's request to have Cohen removed as her supervisor.[48] Finally, Spokony concluded that Anderson's complaint did not raise an issue of class bias.[49] In a letter to Anderson's former counsel, Wolfe stated that she accepted Spokony's findings and recommendations on September 28, 2006.[50]

Anderson appealed the Spokony Report to Presiding

Justice John Buckley on the ground that remedial measures suggested by Spokony—a mandated management skills course for Cohen and an apology to Anderson—were not commensurate with the gravity of Cohen's misconduct.[51] In her Appeal, Anderson alleged that Cohen acted "out of bias toward [her] as a person of color and this is reflected in her dealings with persons of color, or those whom she regards as objectionable, for example, persons she regards as overweight."[52] In a letter dated October 24, 2006, Justice Buckley affirmed the Spokony Report,[53] finding "that the recommendations set forth in the report are proportionate to the complaint and appropriate to restore a professional relationship between Ms. Anderson, the subordinate, and Ms. Cohen, the supervisor."[54] With regard to race discrimination, Justice Buckley found "no evidence in either Ms. Anderson's account of Ms. Cohen's conduct or the investigation that supports a claim of racial bias."[55]

### D. Subsequent Retaliation Against Anderson

After the issuance of the Spokony Report, Anderson alleges that she was subjected to a series of negative job actions. **First** and foremost, Anderson's requests to have Cohen removed as her supervisor were repeatedly rejected by Cahill without explanation.[56] Furthermore, at Wolfe's direction, Cohen began taking notes of her observations of and interactions with Anderson, e.g., documenting when Anderson left work early.[57] Cohen also began to micro-manage Anderson's work and assigned her ministerial duties typically performed by paralegals.[58] Starting in *412 October 2006, Anderson was required to meet with Cohen approximately every other week. At one such meeting, Cohen allegedly referred to Anderson as "silly" and "stupid."[59]

On November 1, 2006, after conferring with Wolfe, Cohen sent a "counseling memorandum" to Anderson for canceling a meeting at the last minute.[60] On January 25, 2007, Cohen requested Wolfe's permission to hold a "counseling session" with Anderson for "her demonstrated refusal to take steps to restore the supervisor's subordinate relationship in accordance with David Spokony's report ...."[61] This request came one day after Anderson's attorney sought confirmation as to whether Cohen attended the management skills course mandated in the Spokony Report.[62] On January 30, 2007, Cohen gave Anderson her **first** partially negative evaluation.[63] Anderson received an "Unsatisfactory" in the category "Responsive to supervision and direction from superiors."[64] In the Comments section of the Evaluation, Cohen wrote that Anderson "needs to take steps to restore supervisor-subordinate relationship" and that she "must stop communicating hostility."[65] This was the **first**

negative evaluation Anderson received after five years of consecutively excellent performance evaluations.[66]

At Wolfe's direction, Spokony scheduled a counseling session with Anderson for February 6, 2007.[67] The day before the scheduled meeting, Anderson notified Spokony that she would not be able to attend for "health reasons."[68] Spokony informed Anderson that he was treating her failure to attend as "insubordinate default, an act which can lead to **disciplinary** action."[69] At the counseling session, held on February 9, 2007, Spokony admonished Anderson for resisting Cohen's supervision.[70] Spokony's Counseling Memorandum, which was placed in Anderson's permanent personnel folder, stated that it could be used in any subsequent **disciplinary** action against her.[71] Spokony did, in fact, use his Counseling Memorandum to support his recommendation for Anderson's termination.[72]

**\*413 E. The Court's Decision to Terminate Anderson**

Following the **First** Department's instructions to Anderson, as conveyed in the Spokony Report, Anderson's hostility toward Cohen became apparent. In an e-mail dated October 30, 2006, Anderson made the following remarks to Cohen:

> 1. You expressed "disappointment" with what you have characterized as my failure to honor a "mutual agreement" to be collegial. Speaking for myself, I made no such agreement ....
>
> 2. I regret that there was no instruction that you be removed from contact with me, inasmuch as your e-mail constitutes a continuation of the same misconduct for which you were admonished....
>
> 3. I shall not address your remarks, of a highly subjective nature, with respect to my demeanor. You have exhibited an "emotional response" of a physical nature, which you have admitted. It is not surprising, therefore, that I would not be comfortable to sit, alone in a room with you, in close physical proximity, thereby risking the possibility of a repetition of that behavior.[73]

There are a host of other e-mails in which Anderson's hostility toward, and refusal to cooperate with, Cohen are evident. For example, on November 13, 2006, Anderson refused to get a file for Cohen, informing Cohen that she "may retrieve the respondent's original file from that office."[74] On November 20, 2006, Anderson refused to provide Cohen with a translation of her shorthand notes, offering her only a "summary transcription."[75] In an e-mail dated December 28, 2006, regarding an attorney **disciplinary** matter, Anderson stated:

> With respect to N, you have now taken on to yourself to re-write an admonition, which was previously signed off on .... In light of the foregoing, I do not believe it will be helpful to sit down for a meeting .... Naturally, I shall not refuse to sit down with Andral Bratton and yourself, but I see very little value to the expenditure of this time.[76]

In that same e-mail, Anderson criticized Cohen for approaching her in the hallway.[77] On March 15, 2007, Anderson described a deposition recommended by Cohen as a "waste of time and money."[78] Finally, on May 9, 2007, Anderson sent an e-mail "to express, in the clearest possible terms, [her] distaste and professional disappointment with [Cohen's] performance at a meeting at 12:28 p.m. today ...."[79] In that e-mail, Anderson states: "I will not be spoken to in the manner in which you did and be subjected to the type of conduct with which you deported yourself in that meeting."[80] Anderson then chides Cohen when she states that she cannot prevent Cohen from pursuing a "dead end."[81] Anderson concludes the e-mail: "I, however, **\*414** will not be subjected to the sort of treatment in which you indulged today and I am putting you on notice accordingly."[82]

Anderson's hostility toward Cohen continued after the February 9, 2007 counseling session, as documented by e-mails forwarded by Cohen to Wolfe on April 11, 2007.[83] At Wolfe's direction, Spokony provided these e-mails and other relevant correspondence to the Acting Presiding Justice and the other Justices of the Court's Liaison **Committee**.[84] In his April 12, 2007 Memorandum, Spokony states that Anderson is "subject to termination" because she "continues to resist appropriate supervision, despite counseling and other efforts to restore a proper supervisor/subordinate relationship."[85]

On May 18, 2007, Anderson postponed a counseling session with Spokony scheduled for May 23, because she was allegedly interviewing new counsel.[86] On that same day, Anderson submitted a Non–Contract Grievance Form to the **First** Department, which included her allegations of whitewashing and Cohen's assault and also mentioned unspecified instances of "disparate treatment."[87] Anderson's grievance was never addressed because she was terminated shortly after its filing.

The final decision to terminate Anderson was made with the approval of Presiding Justice Jonathan Lippman.[88] Shortly after Justice Lippman commenced his duties as Presiding Justice in May 2007, Wolfe apprised him of the employment situation with Anderson and the DDC.[89]

Justice Lippman acknowledged receipt of the documents appended to Spokony's April 12, 2007 Memorandum and discussed the Anderson matter with Spokony in some detail.[90] Justice Lippman noted that no objection to Anderson's proposed termination had been raised by any of the Justices of the DDC Liaison **Committee** (the "Justices").[91] Justice Lippman also discussed the matter with former Presiding Justice Peter Tom.[92] Based on Spokony's recommendation and discussions with his fellow Justices, Justice Lippman concluded that Anderson's ongoing resistance to the instructions contained in the Spokony Report constituted insubordination warranting her dismissal.[93] However, before Anderson was terminated, the Justices of the Liaison **Committee** asked Spokony to check into Cohen's handling of the H. matter given Anderson's allegations.[94] Spokony did so—by reading the H. file and discussing the matter with Cohen—and reported to the Justices that Cohen had acted properly.[95] The Justices then approved **\*415** the final decision and Justice Lippman authorized Spokony to terminate Anderson's employment.[96] Anderson was terminated effective June 8, 2007.[97]

#### F. Plaintiff's Evidence of Racial Animus[98]

At her deposition, Anderson acknowledged that she has no evidence of racial bias on the part of Spokony and Cahill.[99] Plaintiff attempts to show racial bias on Cohen's part by referencing several racist comments she allegedly made. For example, Anderson testified that in 2005, in her presence and that of two other DDC employees, Cohen remarked that she hated homeless people because they are "smelly" and that she does not like to see so many blacks in the subways.[100] In addition, Cohen allegedly told Anderson in 2006 that she wasn't happy that so many "black rappers" were moving near her vacation home, "buying property with their gold chains, with all those gold chains."[101] Plaintiff does not link these comments with the decision to terminate her employment in June 2007.

Plaintiff also attempts to show racial animus on Cohen's part by recounting the experiences of other DDC employees of color. In particular, Anderson deposed two present and one former DDC employees: Nicole Corrado, Monique Hudson, and Kenneth Van Lew. Corrado testified as to her subjective belief that Cohen was racist, citing an incident where Cohen referred to her vacation home gardener as "this little Mexican guy."[102] Corrado reported her belief that Cohen was a racist to Second Deputy Counsel Bratton who, according to Corrado, did not disagree with her "at all."[103] Hudson recounted her subjective belief that Cohen discriminated against people of color including Joseph Wiggly, Grace Jacobs, Nina

Windfield, Marcy Sterling, and Patricia Wilson.[104] Hudson testified that she believed Cohen was harassing Anderson in an effort to get rid of her.[105] Hudson also believed that Cohen was discriminating against her by arbitrarily enforcing DDC's time and attendance **\*416** requirements.[106]

Van Lew submitted an affidavit to support his allegation that DDC employees of color were being singled out and treated negatively by Cohen.[107] Van Lew reportedly witnessed Cohen discriminate against employees of color "by routinely harassing, demeaning, and micro-managing them, until they are eventually forced out of their jobs."[108] Van Lew also claims that Cohen treated him differently than similarly situated Caucasian employees with regard to schedule flexibility, sick day documentation, docking of pay, and a new computer request.[109] In sum, Van Lew claims that Cohen's "harassment of [him] as an African–American unquestionably forced [his] constructive discharge from the DDC."[110]

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[111] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "[112] A fact is material when it " 'might affect the outcome of the suit under the governing law.' "[113] "It is the movant's burden to show that no genuine factual dispute exists."[114]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' "[115] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' "[116] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' "[117] However, **\*417** " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' "[118]

In determining whether a genuine issue of material fact

exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[119] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' "[120] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law."[121]

" 'It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.' "[122] "Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where ... plaintiff has offered little or no evidence of discrimination."[123] Indeed, " '[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.' "[124]

However, greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence may reveal an inference of discrimination.[125] This is so because " '[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.' "[126] But " '[e]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment.' "[127] " '[M]ere conclusory allegations, speculation or conjecture will not avail a party *418 resisting summary judgment.' "[128]

## B. Discrimination Under Title VII

### 1. Unlawful Termination

"To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting laid out by *McDonnell Douglas Corp. v. Green*"[129] "[T]he initial burden rests with the plaintiff to establish a prima facie case of discrimination."[130] A plaintiff meets this burden by showing that: (1) she falls within a protected group; (2) she was qualified for the position she held; (3) she was subject to an adverse employment action; and (4) the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination.[131] The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and 'de minimis.' "[132]

Once a plaintiff establishes a prima facie case, a rebuttable presumption of unlawful discrimination arises and the burden of production shifts to the employer to proffer a "legitimate, nondiscriminatory reason" for the challenged employment action.[133] "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must 'prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' "[134] At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' "[135] In other words, plaintiff is left with the final burden of proving that her race " 'was the real reason' for any adverse employment action."[136] Direct evidence is not required; circumstantial evidence will suffice.[137]

### 2. Hostile Work Environment

[1] Hostile work environment claims brought under New York state law are governed by the same standards applicable to claims brought under Title VII.[138] To *419 prevail on a hostile work environment claim, a plaintiff must show:

(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.[139]

"This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."[140] Of course, the conduct creating the hostile work environment must have been motivated by the protected characteristic, *e.g.*, race.[141]

[2] "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' "[142] Isolated acts do not generally meet the threshold of severity or pervasiveness.[143] In determining whether there is a hostile work environment, courts must look to the following factors:

(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what

psychological harm, if any, resulted.[144]

[3] In sum, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment."[145] In considering the above factors, however, courts must keep in mind that Title VII is not a workplace "civility code."[146]

## *420 C. Section 1983 First Amendment Retaliation Claim

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[147] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[148]

[4] To establish a retaliation claim in violation of the **First** Amendment right to free speech, a plaintiff must show *first,* that the speech at issue was protected; *second,* that she suffered an adverse employment action; and *third,* that there exists a causal connection between the speech and the adverse employment action.[149] With respect to the **first** prong, the Supreme Court has made clear that "public employees do not surrender all of their **First** Amendment rights by reason of their employment."[150] "Whether public employee speech is protected from retaliation under the **First** Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.' "[151]

[5] The Supreme Court has stated that when a public employee makes statements pursuant to her official duties, she does not speak as a citizen for **First** Amendment purposes.[152] Accordingly, "the Constitution does not insulate her communications from employer discipline" based on the employer's reaction to the speech.[153] Thus, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."[154] The Supreme Court has rejected the "notion that the **First** Amendment shields from discipline *421 the expressions employees make pursuant to their professional duties."[155]

"Employee expression is not a matter of public concern when it 'cannot be fairly considered as relating to any matter of political, social, or other concern to the community.' "[156] " '[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision.' "[157] "In making its determination, the court should focus on the motive of the speaker, and attempt to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."[158]

[6] If an employee spoke as a citizen on a matter of public concern, a **First** Amendment claim may, but does not automatically, arise. The next question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."[159] "This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."[160] "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."[161] Thus, a balance has been sought "both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions."[162]

## III. DISCUSSION

### A. Discrimination Claims

#### 1. Unlawful Termination

[7] Plaintiff claims that she was "singled out for discriminatory and abusive treatment," which included being summarily discharged from employment "without cause" because of her race, color, and/or national origin.[163] Plaintiff's unlawful termination claim fails, however, because the circumstances surrounding her discharge *422 do not give "rise to an inference of" discrimination.[164] Given the absence of any evidence of discrimination on the part of Spokony and Cahill, Anderson must show that Cohen tainted the **First** Department's termination decision with discriminatory animus. To do this, Anderson must show that: (1) Cohen

had a role in the decision-making process; (2) Cohen discriminated against Anderson because of her race, color and/or national origin; and (3) the Justices' decision-making process was influenced by Cohen's discriminatory animus.

As for the first requirement, Cohen may have influenced the termination decision, albeit indirectly, by supplying the ultimate decision makers with information about Anderson. Both Wolfe and Spokony relied on Cohen to inform them about Anderson's employment situation. Their reliance is evidenced by the fact that Spokony's recommendation to terminate Anderson came one day after Cohen forwarded to Wolfe numerous e-mails she received from Anderson. In addition, the Justices relied on information tunneled to Spokony and Wolfe from Cohen. For example, when the Justices asked Spokony to investigate the matter of "H." before terminating Anderson, Spokony spoke only to Cohen. Given the significance of Cohen's input, plaintiff's unlawful termination claim is not foreclosed by the absence of " 'evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the ... process.' "[165]

With regard to the second requirement, Anderson's evidence of Cohen's discriminatory animus consists, in part, of the three statements allegedly made by Cohen in Anderson's presence. One of those statements, the statement about "smelly" homeless people, does not relate to race, color and national origin and can therefore be completely discounted. The other two remarks—about too many blacks in the subway and black rappers moving near Cohen's vacation home—are not particularly probative of discrimination for several reasons, whether or not they are categorized as "stray comments."[166] *First,* because the comments were not made by a decision-maker, they may be considered stray comments.[167] *Second,* the comments were temporally remote to plaintiff's termination, having allegedly been uttered in 2005 and 2006.[168] Finally, the comments were not directed toward plaintiff, and were unrelated to her discharge.[169] In **\*423** sum, the race-related comments allegedly made by Cohen are insufficient to establish race discrimination with respect to Anderson's termination.

In addition to Cohen's comments, plaintiff attempts to show bias through the deposition testimony of two DDC employees, Corrado and Hudson, and an affidavit from a former DDC employee, Van Lew. Corrado and Hudson stated their subjective belief that Cohen discriminated against DDC employees of color. However, their statements are conclusory and devoid of any factual

circumstances linking Cohen to any discriminatory conduct.[170] Van Lew, on the other hand, provides concrete instances in which he believes he was treated less favorably by Cohen than similarly situated Caucasian employees.[171] The specific instances of discrimination described by Van Lew provide some credible evidence that Cohen's conduct toward employees of color, including Anderson, was motivated, at least in part, by racial animus.

Assuming, then, that Anderson has shown that Cohen's conduct toward her was racially motivated, there simply is no evidence that Cohen's racial bias tainted the Justices' ultimate decision to terminate her. The Justices established a mediation panel in September 2006 in order to assess and resolve the conflict between Anderson and Cohen stemming, in part, from the July 2006 incident. The mediation panel interviewed Anderson separately from Cohen to give her ample opportunity to express her point of view. In addition to the panel's interviews, the Justices had a host of documents detailing Anderson's persistent campaign to avoid and discredit Cohen.[172] While some of the information conveyed to the Justices did, in fact, come from Cohen, there is no evidence that Cohen editorialized or filtered the information she submitted in such a way as to advance any discriminatory motives. To the contrary, Anderson's verbal and written communications, along with the attachments appended to the April 12, 2007 Memorandum, gave the Justices more than enough objective information in which to conduct an "independent evaluation" of Anderson's situation. The Justices' final decision in favor of termination is thus not vulnerable to attack.[173] Because plaintiff has failed to establish a prima facie case with regard to her discharge, her unlawful termination claim must be dismissed.[174]

## \*424 2. Hostile Work Environment

[8] [9] Anderson claims, under federal and state law, that she was subjected to a hostile work environment because of her race, color and national origin.[175] In creating a hostile work environment, Anderson alleges that defendants: accused her of refusing to follow instructions; gave her a negative performance evaluation; and subjected her to an unwarranted counseling session.[176] In addition, Cohen is alleged to have made racist remarks.[177] Negative job evaluations and increased scrutiny, without any attendant consequences such as demotion or diminution of wages, are not considered adverse employment actions which can support a hostile work environment claim.[178] Furthermore, Cohen's alleged racist remarks, which plaintiff heard over the course of several

years, do not constitute pervasive conduct amounting to a hostile work environment.[179] Accordingly, plaintiff's hostile work environment claim must be dismissed because: (1) when viewed objectively, the conduct in issue was not sufficiently severe or pervasive to alter the conditions of her employment;[180] and (2) there is no evidence that the conduct occurred because of plaintiff's race, color or national origin.[181]

Anderson appears to concede the futility of her hostile work environment claim when she states: "Assuming that under federal law the harassment that Anderson experienced did not rise to a hostile work environment, under the New York City Human Rights Law ('NYC HRL') it did."[182] Plaintiff notes that the Local Civil Rights Restoration Act of 2005 amended the HRL to provide for "a more protective standard for determining workplace harassment than federal and New York State law."[183] However, because plaintiff's Second Amended Complaint alleges hostile work environment claims under **\*425** federal and state law only, this new claim premised on the NYC HRL is precluded.[184] Accordingly, plaintiff's hostile work environment claims are dismissed.

In sum, Anderson's unlawful termination claim is dismissed because she has failed to establish a prima facie case and, even if she had, she has failed to rebut defendants' legitimate, nondiscriminatory reason as a pretext for unlawful discrimination. In addition, Anderson's hostile work environment claims are dismissed because the conduct of which she complains was not sufficiently severe to alter the conditions of her employment.

### 3. Section 1981

[10] Plaintiff has brought a claim under section 1981 against all defendants, alleging that they have denied her the "rights to full and equal benefit of the laws as a result of her race with respect to the performance, modification, and termination of Plaintiff s contract and contractual employment relationship, and with respect to the enjoyment of all benefits, privileges, terms, and conditions of that contractual relationship."[185] To establish a claim under section 1981, plaintiff must show that: (1) she is a member of a racial minority group; (2) defendants intended to discriminate against her on the basis of race; and (3) the discrimination concerned one of the activities enumerated in section 1981[186] which includes the right to make and enforce contracts, the right to sue, and the right "to the full and equal benefit of all laws and proceedings for the security of persons and property."[187]

[11] Plaintiff's efforts to establish the second element of a section 1981 claim—intentional discrimination on the basis of race—are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII.[188] Intentional discrimination is a necessary element of an employment discrimination claim under both section 1981 and Title VII.[189] Thus, "a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under § 1981."[190] Because plaintiff has failed to show intentional discrimination by any of the defendants, her section 1981 claim must be dismissed in its entirety.[191]

### *426 4. Section 1983

[12] Plaintiff has brought a claim against all defendants pursuant to section 1983 for the alleged violation of her rights under the Fourteenth Amendment to the United States Constitution.[192] In particular, plaintiff claims that her rights to equal protection and due process were violated when defendants discriminated against her on account of her race, color, and national origin.[193] However, Anderson's section 1983 claim must be dismissed against the governmental entity defendants (N.Y.S and OCA) and the individual defendants in their official capacities on the basis of sovereign immunity under the Eleventh Amendment.[194]

[13] Plaintiff's only remaining claims under section 1983 are against the individual defendants acting in their individual capacities.

> To state a prima facie case under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent.[195]

Here, Anderson clearly fails to satisfy the second and fourth prongs as her Second Amended Complaint is devoid of any comparison to similarly situated Caucasian Principal Attorneys accused of insubordination who were treated more favorably than Anderson. Accordingly,

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

because plaintiff's equal protection claim cannot withstand summary judgment, it must be dismissed.

[14] With regard to her due process claim, Anderson must show the following three elements to support a claim of an unconstitutional taking in violation of the Fourteenth Amendment and section 1983: (1) a property interest; (2) that has been taken under the color of state law; (3) without due process or just compensation.[196] With regard to the **first** requirement—a property interest—plaintiff has not shown that she had tenure or any other specific guarantee of employment. Thus, her employment at DDC can be described as "at-will." Consequently, plaintiff's procedural due process claims fails "because at-will employment is not a constitutionally protected property interest."[197] As a result, her due process claim must also be dismissed.

**\*427 B. Plaintiff's First Amendment Retaliation Claim**

**1. Plaintiff Engaged in Protected Speech**

[15] In her Second Amended Complaint, Anderson alleges that she

> was targeted for harassment and abuse, and was retaliated against, after she discovered and reported acts of misconduct and corruption within the DDC, which constituted an abuse of the power and a fraud upon the public. The conduct and actions of defendants in retaliating against Plaintiff and subjecting her to a hostile work environment, culminating in the constructive demotion and termination of her position and employment, were wrongful, oppressive and unlawfully taken in retaliation against her for having exercised her Constitutional Right of Free Speech as a private citizen regarding matters of public concern to the community.[198]

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."[199] At issue is whether the employee's speech was "calculated to redress personal grievances or whether it had a broader

public purpose."[200] Accordingly, this Court must evaluate whether Anderson's alleged whistle-blowing comments were made in her role as a Principal Attorney fulfilling her professional responsibilities or as a private citizen concerning matters of public concern.

Defendants argue that plaintiff was not speaking as a citizen on matters of public concern when she criticized the DDC for alleged whitewashing because plaintiff: (1) did not speak out in public, nor did she express an intention to do so, before filing the instant action; and (2) did not make any statements about *quid pro quo* corruption on the part of any DDC personnel. Defendants further argue that Anderson's "disputes with how the DDC was handling certain cases were limited to disagreement with the prosecutorial discretion exercised by her superiors."[201]

Anderson's deposition testimony acknowledged that DDC operates in a manner analogous to a prosecutor's office, that prosecutorial discretion needs to be applied as part of DDC's work, and that reasonable attorneys can differ on application of prosecutorial discretion. The comments Anderson claims to have made merely reflect differences in approach concerning specific case handling in a few instances and differences in how hard the office should press on charges in prosecutions. Discussion with colleagues about the use of prosecutorial discretion is a necessary and expected part of a DDC attorney's work. The comments plaintiff claims she made about the use of discretion in specific cases simply cannot be transformed into speech on systemic claims of corruption.[202]

**\*428** *Garcetti* and its progeny dictate that speech made by a public employee pursuant to her professional duties does not fall under the purview of the **First** Amendment because it is not spoken as a private citizen. *Garcetti* involved a deputy district attorney who claimed that he was retaliated against for recommending the dismissal of a case because of a flawed affidavit used to obtain a critical search warrant.[203] The Court found that the plaintiff's speech was not protected because it was "made pursuant to his duties as a calendar deputy."[204] In finding that the plaintiff was acting as a public employee with regard to an internal matter, the Court noted that "[plaintiff] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case."[205] Exercising similar reasoning, district courts in the Second Circuit have dismissed **First** Amendment retaliation claims where plaintiffs have alleged that their protected speech resulted from the fulfillment of job duties.[206]

This case is patently distinguishable from *Garcetti*.

Whereas the prosecutor in *Garcetti* spoke out about a single case pending in his office, Anderson spoke out about systemic problems at the DDC, thereby making her speech protected.[207] Where a public employee's speech concerns a government agency's breach of the public trust, as it does here, the speech relates to more than a mere personal grievance and therefore falls outside *Garcetti*'s restrictions.[208]

Furthermore, plaintiff did not engage in speech pursuant to her official duties as a Principal Attorney for the DDC when she complained about whitewashing. Anderson's job duties as a Principal Attorney were to "research legal questions and issues, organize complex investigations, prepare and present complex cases before administrative tribunals and trial and appellate courts, and perform related duties."[209] Speaking out about improper DDC practices was clearly not one of Anderson's job duties. Cahill reinforced this point at a meeting held on October 11, 2006, where he told Anderson that "she did not make policy decisions [and] that her function was limited to matters assigned to her."[210] Because Anderson was not required *429 to speak out about DDC whitewashing cases, she expressed her views as a private citizen, not as a public employee, under *Garcetti*.[211]

Moreover, the fact that Anderson expressed her views about the DDC within the workplace does not strip them of constitutional protection.[212] Although a statement made at work, and in private, may militate against a finding of public concern, it is not dispositive.[213] Indeed, the Supreme Court in *Garcetti* expressly noted the fact that an employee engages in speech "inside his office, rather than publicly" is not dispositive because "[m]any citizens do much of their talking inside their respective workplaces[.]"[214] As such, it would undermine the goal of "treating public employees like any member of the general public to hold that all speech within the office is automatically exposed to restriction."[215] Here, Anderson engaged in speech in the workplace, but that does not preclude this Court from finding that her speech addressed a matter of public concern.

**2. Plaintiff Suffered an Adverse Employment Action**

[16] Plaintiff has offered sufficient facts to support her allegation that she suffered an adverse employment action. For purposes of a **First** Amendment retaliation claim, an employment action is adverse if it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights ...."[216] Anderson claims that she suffered two adverse employment actions:

"1) her discharge; and 2) the cumulative negative job actions taken against her which made her work environment 'unreasonably inferior and adverse.' "[217] Because it is beyond dispute that Anderson's discharge constituted an adverse employment action, she has satisfied this element.

**3. There is a Material Question of Fact Regarding Causation**

[17] A plaintiff can establish the causal connection necessary for a **First** Amendment retaliation claim by showing that her *430 protected activity was followed closely in time by the adverse employment action.[218] Temporal proximity is strong circumstantial evidence of improper intent.[219] While it is not the sole factor to be considered in establishing causation, nor is it dispositive, it creates a strong inference of causation, particularly where plaintiff does not allege that she engaged in numerous acts of speech over a long period of time.[220] There is no bright line for how close in time the adverse employment action must follow the protected activity in order to sustain the causation element.[221] There is, however, substantial authority holding that a period between five and six months is sufficient.[222]

Defendants argue that plaintiff's retaliation claim should be dismissed because she cannot show a causal connection between her protected speech and her eventual discharge.[223] In particular, defendants argue that plaintiff has no direct evidence of retaliatory motive and that she fails to show sufficient temporal proximity between the alleged whitewashing statements she made to Wolfe in August 2006 and her termination in June 2007.

Although defendants focus on the period between Anderson's conversation with Wolfe in August 2006 and her subsequent discharge in June 2007, there is evidence that Anderson complained about DDC whitewashing in November–December 2006, in connection with the case of "D.N."[224] And although Anderson's official discharge was in June of 2007, the decision initiating the termination process was made by Spokony in April 2007. Thus, using these alternative dates, the gap between the protected activity and the adverse employment action is approximately four months. There is, therefore, a material question of fact as to whether plaintiff has shown a causal connection between her protected speech and her discharge. Defendants' motion for summary judgment on Anderson's **First** Amendment retaliation claim is denied.

#### 4. Motive

Defendants argue, in conclusory terms, that they would have fired Anderson, even in the absence of her protected activity, *431 because of her insubordination.[225] Whether defendants would have done so turns on motive, which ordinarily should not be decided on summary judgment.[226] This Court cannot assess whether defendants were motivated to fire Anderson because of her protected speech as opposed to other factors. Disentangling the permissible from the impermissible reasons for Anderson's termination is a matter for the jury, not this Court. Furthermore, there is a question of fact as to whether defendants tried to induce Anderson's insubordination by refusing to remove Cohen as her supervisor, in order to have a pretext for firing her. If so, Anderson's alleged insubordination is not the real reason for her discharge. "Where the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction."[227] A reasonable jury could find that defendants refused to remove Cohen as Anderson's supervisor so they could use Anderson's inevitable resistance to Cohen's continuing supervision as a pretext for firing her, thereby obscuring their illegitimate and retaliatory discharge of plaintiff.

#### C. Plaintiff's Breach of Contract Claim

Plaintiff brings a state law breach of contract claim alleging that NYS and OCA

> entered into a contract of employment with Plaintiff which carried with it express and implied promises that Plaintiff would be protected under the terms of the contract, that these Defendants would honor the terms of the contract, and that they would not discriminate against her because of her National Origin, race or color during the course of her employment with the Defendants State and OCA.[228]

Plaintiff further alleges that NYS and OCA breached the contract of employment by: (1) discriminating against her on the basis of race, color and national origin; (2) summarily discharging her without a hearing; and (3) punishing her for adhering to and upholding the ethical rules of the legal profession.[229]

[18] Plaintiff's breach of contract claim fails as a matter of

law for several reasons. *First*, I have already found that plaintiff has failed to offer proof that the relevant decision makers discriminated against Anderson when they terminated her employment. Nor has plaintiff shown that she was subjected to a hostile work environment for purposes of Title VII. This lack of discrimination under Title VII also dooms plaintiff's allegation that defendants NYS and OCA willfully and intentionally breached the contract of employment by discriminating against her.[230] *432 *Second,* plaintiff alleges that "Article 12.1 of the Union Agreement states that an attorney in Plaintiff's position 'shall not be removed or otherwise subjected to any **disciplinary** penalty ... except for incompetency or misconduct shown *after a hearing* upon stated charges ....' "[231] Defendants argue that as a Principal Attorney at the DDC, plaintiff was a "confidential employee" not covered by the Union Agreement's hearing requirement.[232] Anderson has failed to refute defendants' argument. Accordingly, the hearing requirement does not apply to Anderson who was an "at-will" employee. Failing to hold a hearing prior to the discharge of a confidential, at-will employee cannot, as a matter of law, support a claim for breach of an employment contract. Finally, plaintiff's third ground in support of her breach of contract claim relies on an alleged agreement—implicit in every employment relationship among lawyers according to Anderson—"that all lawyers shall conduct themselves in accordance with the prevailing legal codes of conduct and ethical standards applicable to all lawyers."[233] Plaintiff alleges that she was punished for reporting ethical misconduct in violation of this implicit requirement.[234] But this claim is duplicative of plaintiff's **First** Amendment retaliation claim and must be dismissed.[235] In sum, plaintiff's state law breach of contract claim is dismissed.

#### IV. CONCLUSION

For the foregoing reasons, plaintiff's discrimination claims are dismissed, as is her *433 breach of contract claim. Plaintiff's **First** Amendment retaliation claim remains. The Clerk of the Court is directed to close defendants' motion for summary judgment (Document # 63). A status conference is scheduled for May 8, 2009, at 5:30 p.m., in Courtroom 15C.

SO ORDERED:

#### All Citations

614 F.Supp.2d 404

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

Footnotes

1        Defendants are two public entities—the State of New York ("NYS") and the Office of Court Administration of the Unified Court
         System ("OCA")—and three individuals—Thomas Cahill, Sherry Cohen and David Spokony.

2        Codified at 42 U.S.C. § 2000e *et seq.*

3        Plaintiff was born in Jamaica, West Indies, and has black, Asian and white ancestry. For the purposes of this action, she considers
         herself to be African–American. *See* Second Amended Complaint ("Cmpl.") ¶ 11.

4        *See id.* ¶ 17.

5        *See id.* ¶ 20.

6        *See* Defendants' Statement Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 6.

7        *See id.*

8        *See id.* ¶ 4.

9        *See id.*

10       *See id.* ¶ 7.

11       *See* Cmpl. ¶ 26.

12       *See id.* ¶ 27.

13       *See id.*

14       *See id.* ¶ 28.

15       *See id.* ¶ 29.

16       Deposition of Christine Anderson ("Anderson Dep."), Ex. 1 to the Affirmation of John A. Beranbaum ("Beranbaum Aff"), plaintiff's
         counsel, at 82.

17       *See id.* at 81, 83–85, 86–87, 102, 120–22, 128, 129.

18       *See id.* at 76–77.

19       *See id.* at 77.

20       *See id.*

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

21      *See id.* at 77–78; Deposition of Sherry Cohen ("Cohen Dep."), Ex. 5 to the Beranbaum Aff., at 64–66.

22      *See* Deposition of Thomas Cahill ("Cahill Dep."), Ex. 3 to the Beranbaum Aff., at 106.

23      *See* Anderson Dep. at 77.

24      *See* Declaration of David Spokony ("Spokony Decl."), Ex. E, at 2.

25      *See* Def. 56.1 ¶ 12.

26      *See id.*

27      *See id.*

28      *See id.* ¶ 13.

29      *See* Plaintiff's Response to Defendants' Statement Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 13.

30      *See id.*

31      *Id.* Anderson claims that although the wound was not deep, there was some bleeding, which Anderson washed and bandaged by herself. *See* Anderson Dep. at 56. Defendants note that Anderson was able to go about her business the rest of the day. *See* Incident Report, Ex. B to the Spokony Decl, at 2.

32      *See* Def. 56.1 ¶ 13.

33      *Id.*

34      *See id.*

35      *See* Anderson Dep. at 88.

36      *See id.* at 89.

37      *See id.* at 92. The two incidents include the telephone call in which Cohen raised her voice and the office incident.

38      *See* Deposition of Catherine O'Hagan Wolfe ("Wolfe Dep."), Ex. 9 to the Beranbaum Aff, at 93.

39      *See* Anderson Dep. at 93 ("I have seen incidents of which I disapprove where the complainants are not being served.").

40      For example, Anderson spoke out once again against DDC practices in the course of working on the case of "D.N." In November and December 2006, Cohen and Cahill rejected Anderson's admonition of D.N. for intentional misrepresentation. With Cahill's concurrence, Cohen insisted that D.N. be admonished for a lesser violation. *See* Anderson Dep. at 84, 98–99. When Anderson objected to eliminating the more serious charge, Cohen removed her from the case and re-wrote the memorandum herself. *See id.* Anderson complained to Cohen and Cahill that the case of D.N. was symptomatic of the DDC not fulfilling its mandate.

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

> I went and I reported that to Cahill and I said to Cahill, I do not like the way selective respondents are treated, we are not fulfilling our mandate, we are shortchanging the public. I said, think of these poor people, these complainants who are not getting justice. I said, we are not fulfilling our mandate.
> *Id.* at 85.

41      *Id.* at 98.

42      *Id.* at 95.

43      *See* Deposition of David Spokony ("Spokony Dep."), Ex. 8 to the Beranbaum Aff., at 20.

44      *See* 9/26/06 Memorandum from Spokony to Wolfe ("Spokony Report"), Ex. B to the Spokony Decl., at 3.

45      *See id.* at 4.

46      *See id.* at 5.

47      *See id.* at 3.

48      *See id.* at 5–6. Although one of the panel members suggested that Anderson could be supervised by a different attorney, Wolfe believed that the attorney lacked the appropriate supervisory skills. *See* Wolfe Dep. at 71.

49      *See* Spokony Report at 6 ("None of the words or actions used by Ms. Cohen were motivated by bias. Nothing in Ms. Anderson's account reflected that she was singled out unlawfully.").

50      *See* 9/29/06 Letter from Wolfe to Gary Phelan, plaintiff's former counsel, Ex. B to the Spokony Decl., at 7.

51      *See* 10/13/06 Appeal From Decision of the Appellate Division, **First** Department Matter of Christine C. Anderson, Esq. Re: Sherry K. Cohen ("Appeal"), Ex. B to the Spokony Decl., at 9.

52      *Id.* at 11.

53      *See* 10/24/06 Letter from Presiding Justice Buckley to Phelan, Ex. B to the Spokony Decl., at 13 ("The Clerk of the Court's acceptance of the Deputy Clerk of the Court's report is affirmed.").

54      *Id.* at 12.

55      *Id.* at 13.

56      *See* 10/20/06 E-mail from Anderson to Cahill, Ex. C to the Spokony Decl., at 1.

57      *See* Wolfe Dep. at 135.

58      *See* 2/19/07 Answer to Statement Set Forth in Counseling Meeting and Memorandum ("Answer"), Ex. D to the Spokony Decl., at 7 ("Among numerous examples [of harassment] was Ms. Cohen's new practice of asking for information as to an investigation, by voice mail, repeating that precise question via email and, again, at a meeting in her office. After six years working as a principal attorney and conducting investigations, Ms. Cohen has now recently begun to instruct me, via email, on how to conduct an investigation. Such conduct amounts to a virtual stalking of myself, by Ms. Cohen, and is plainly harassment of me.").

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

79    5/9/07 E-mail from Anderson to Cohen, Ex. C to the Spokony Deck, at 15.

80    *Id.*

81    *Id.*

82    *Id.*

83    *See* Spokony Decl., Ex. C, at 11 (enclosing e-mails dated 1/18/07, 2/26/07, 2/28/07, 2/29/07, 3/15/07, 3/29/07, 4/4/07 and 4/10/07).

84    *See* 4/12/07 Memorandum.

85    *Id.*

86    *See* 5/18/07 E-mail from Anderson to Spokony, Ex. D to the Spokony Decl, at 11.

87    *See* Non–Contract Grievance Form, Ex. F to the Spokony Decl., at 4.

88    *See* Declaration of Presiding Justice Jonathan Lippman ("Lippman Decl.") ¶ 4.

89    *See id.*

90    *See id.* ¶ 5.

91    *See id.*

92    *See id.* ¶ 6.

93    *See id.* ¶ 7.

94    *See* Def. 56.1 ¶ 39.

95    *See* 5/24/07 Memorandum from Spokony to Justices, Ex. E to the Spokony Decl., at 2 ("The file in the 'H' reflects that this matter was properly investigated and evaluated. The final 20–page recommendation to the **Disciplinary Committee** was made on the basis of discretion, experience and considered professional prosecutorial judgment.").

96    *See* Lippman Decl. ¶ 8.

97    *See* Def. 56.1 ¶ 35. Although Cohen was aware that Anderson might be terminated, she was not notified of her actual termination until it occurred. *See id.* ¶ 36.

98    In the Factual Background section of her Second Amended Complaint, Anderson alleges that she was discriminated against on account of her race, not her national origin. *See* Cmpl. ¶ 30 ("Cohen also discriminated against Plaintiff because of her race, and against other non-white employees in the office.... Plaintiff was aware of a number of reports of racial discrimination and harassment by Cohen against other employees of color."). Thus, plaintiff's claims of national origin discrimination are subsumed

Anderson v. State of New York, Office of Court Admin. of..., 614 F.Supp.2d 404...

117   *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

118   *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505).

119   See *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

120   *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

121   *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486–87 (2d Cir.2006)).

122   *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001)). *Accord Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation.").

123   *Alphonse v. State of Connecticut Dep't of Admin. Servs.,* No. Civ.3:02CV1195, 2004 WL 904076, at *7 (D.Conn. Apr. 21, 2004) (quotation marks and citation omitted).

124   *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir.2004) (quoting *Abdu–Brisson,* 239 F.3d at 466) (alteration in original).

125   See *id.*

126   *Sadki v. Suny Coll. at Brockport,* 310 F.Supp.2d 506, 515 (W.D.N.Y.2004) (quoting *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999) (quotation marks and citation omitted, alteration in original)).

127   *Flakowicz v. Raffi Custom Photo Lab, Inc.,* No. 02 Civ. 9558, 2004 WL 2049220, at *8 (S.D.N.Y. Sept. 13, 2004) (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)).

128   *Conroy v. New York State Dep't of Corr. Servs.,* 333 F.3d 88, 94 (2d Cir.2003) (quoting *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996) (alteration in original)). *Accord Cameron v. Community Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003) ( " '[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment.) (quoting *Meiri,* 759 F.2d at 998) (alteration in original).

129   *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Woodman v. WWOR–TV,* 411 F.3d 69, 76 (2d Cir.2005) (applying *McDonnell Douglas* framework to age discrimination claim)).

130   *Cross v. New York City Transit Auth.,* 417 F.3d 241, 248 (2d Cir.2005).

131   See *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003); *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001).

132   *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001). *Accord Woodman,* 411 F.3d at 76.

133   *Woodman,* 411 F.3d at 76.

134   *Id.* (quoting *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001)).

135   *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).